MASCHOFF BRENNAN GILMORE
    ISRAELSEN & MAURIEL LLP
Sterling A. Brennan (UBN 10060)
    *sbrennan@mabr.com*
L. Rex Sears (UBN 8548)
    *rsears@mabr.com*
95 South State Street, Suite 800
Salt Lake City, UT 84111
(801) 297-1850

THE FOWLER LAW FIRM, P.C.
Michael J. Smith (*pro hac vice forthcoming*)
    *msmith@thefowlerlawfirm.com*
3301 Northland Drive, Suite 101
Austin, TX 78731
(512) 441-1411

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CUSTOM COURTS, INC., SOUTHWEST COURTS AND FLOORS, INC., ALLSPORT AMERICA, INC., TD SPORTS, INC., SPORT COURT OF THE ROCKIES, LLC, SPORTS FACILITIES, LTD., SPORTSCAPE LTD, SPORT COURT MIDWEST, INC., COURT OF SPORT INC., COURT DEVELOPMENT, INC., SPORT COURT CAROLINA, INC., CAROLINA SPORT COURT, LLC, SPORT COURT OF SOUTH FLORIDA, INC., LEGENDARY SPORTS CONSTRUCTION OF NV, LLC f/k/a SPORT COURT OF NEVADA LLC, SPORT COURT OF ARKANSAS, and HELFERS LAWN AND LANDSCAPE, LLC d/b/a SPORT COURT ST. LOUIS,<br><br>     Plaintiffs<br><br>v.<br><br>CONNOR SPORT COURT INTERNATIONAL, LLC, GERFLOR USA INC., and SNAP LOCK INDUSTRIES, INC. | Case No. 2:25-cv-01048<br><br>**ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**<br><br>JURY DEMANDED |

Plaintiffs Custom Courts, Inc., Southwest Courts And Floors, Inc., Allsport America, Inc., TD Sports, Inc., Sport Court of the Rockies, LLC, Sports Facilities, Ltd., Sportscape Ltd, Sport Court Midwest, Inc., Court Of Sport Inc., Court Development, Inc., Sport Court Carolina, Inc., Carolina Sport Court, LLC, Sport Court Of South Florida, Inc., Legendary Sports Construction of NV, LLC f/k/a Sport Court of Nevada LLC, Sport Court Of Arkansas, And Helfers Lawn And Landscape, LLC ("Plaintiffs"), by and through their attorneys, The Fowler Law Firm, P.C. and Maschoff Brennan file this complaint against Defendants Connor Sport Court International, LLC ("CSCI"), Gerflor USA Inc. ("Gerflor") and Snap Lock Industries, Inc. (Snap") and alleges as follows:

## INTRODUCTION

1.      In 1974, Sport Court, Inc., pioneered the concept of the backyard game court, introducing high-performance sports flooring systems for both indoor and outdoor applications. Sport Court also pioneered and became the leader in modular tile sports floors. In 2005, Sport Court, Inc. merged with Connor Sports Flooring, an industry leader in sports hardwood flooring since 1872, to form Defendant Connor Sport Court International, LLC ("CSCI") a manufacturer and distributor of sports flooring for indoor and outdoor, residential and commercial applications such as basketball, tennis, volleyball, pickleball and multi-sport courts which have been marketed and sold under the Sport Court® brand for over 50 years with endorsements from organizations such as the NBA, USTA, NCAA, USA Volleyball, FIBA Basketball, Futsal and U.S. Soccer.

2.      Over that 50-year history, Sport Court® has become the recognized leader providing game courts to families, schools, municipalities, and collegiate and professional sports

organizations. That reputation has been built through the hard work and dedication of an exclusive distributor network. These individual distributors have, in most cases, built family businesses around the original Sport Court® mission of providing children and families with a safe place to practice sports together at home, building community and promoting physical activity – the idea being that playing together strengthens family and community bonds.

3.      Defendant Gerflor USA, Inc. ("Gerflor"), the United States arm of global flooring manufacturer Gerflor Group, acquired CSCI in November 2014.

4.      Defendant Snap Lock Industries, Inc. ("Snap") manufactures sports flooring surfaces under the SnapSports brand and is a direct competitor of CSCI in residential and commercial sports flooring.

5.      In April 2023, Gerflor acquired Snap bringing the SnapSports brand under the same ownership as CSCI.

6.      Plaintiffs all have (or, until recently had) exclusive distribution agreements with Defendant Connor Sport Court International ("CSCI") allowing them to be exclusive distributors in their specified geographic territories.

7.      The acquisition of Snap by Gerflor has resulted in violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2), Sections 7 and 8 of the Clayton Act (15 U.S.C. §18 and 19).

8.      Further, CSCI has breached its agreements with Plaintiffs resulting in damage to Plaintiffs' businesses.

## PARTIES

9.    Plaintiff Custom Courts, Inc. is a corporation organized under the laws of Georgia and has been a residential and commercial Sport Court® Distributor since 1992 and under an exclusive residential agreement with CSCI since 2006 and an exclusive commercial agreement with CSCI since 2011.

10.    Plaintiff Southwest Courts and Floors, Inc. is a corporation organized under the laws of Texas. Its owner, Greg Dettman, has been a Sport Court Dealer since 1978 and the company has been a residential Sport Court® Distributor since 1995 and under an exclusive agreement with CSCI since 2007, and a commercial Sport Court® Distributor under an exclusive agreement with CSCI.

11.    Plaintiff AllSport America, Inc. is a corporation organized under the laws of California and has been a residential Sport Court® Distributor for over 40 years, under an exclusive residential and non-exclusive commercial agreement with CSCI since 2006.

12.    Plaintiff TD Sports, Inc. is a corporation organized under the laws of Delaware and has been a residential Sport Court® Distributor since 1988, under an exclusive agreement with CSCI since 2006, and a commercial Sport Court® Distributor under an exclusive agreement with CSCI since 2006.

13.    Plaintiff Sport Court of the Rockies, LLC is a limited liability company organized under the laws of Colorado and has been a residential and commercial Sport Court® Distributor since 2012 under an exclusive agreement with CSCI.

14.    Plaintiff Sports Facilities, Ltd. is a corporation organized under the laws of Minnesota and has been a residential Sport Court® Distributor under an exclusive agreement

with CSCI since 2001, and a commercial Sport Court® Distributor under an exclusive agreement with CSCI since 2005.

15.    Plaintiff Sportscape Ltd. is a corporation organized under the laws of Ohio and has been a residential Sport Court® Distributor since 1992, under an exclusive agreement with CSCI since 2006, and a commercial Sport Court® Distributor under an exclusive agreement with CSCI.

16.    Plaintiff Sport Court Midwest, Inc. is a corporation organized under the laws of Illinois and has been a residential Sport Court® Distributor since 2004 under an exclusive agreement with CSCI.

17.    Plaintiff Court of Sport, Inc. is a corporation organized under the laws of Illinois and has been a commercial Sport Court® Distributor since 2013 under an agreement with CSCI.

18.    Plaintiff Court Development, Inc. is a corporation organized under the laws of Washington and has been a residential Sport Court® Distributor since 1976, under an exclusive residential and nonexclusive commercial agreement with CSCI since 2014.

19.    Plaintiff Sport Court Carolina, Inc. is a corporation organized under the laws of South Carolina and has been a commercial Sport Court® Distributor under an exclusive agreement with CSCI since 2016.

20.    Plaintiff Carolina Sport Court, LLC is a limited liability company organized under the laws of North Carolina and has been a residential Sport Court® Distributor since 2007 and under its current exclusive agreement with CSCI since 2022.

21.    Plaintiff Sport Court of South Florida, Inc. is a corporation organized under the laws of Florida and has been a residential and commercial Sport Court® Distributor under an exclusive agreement with CSCI since 2019.

22.    Plaintiff Legendary Sports Construction of NV, LLC f/k/a Sport Court of Nevada, LLC is a limited liability company organized under the laws of Nevada and has been an exclusive residential and non-exclusive commercial Sport Court® Distributor under an agreement with CSCI since 2019.

23.    Plaintiff Sport Court of Arkansas is a partnership organized under the laws of Arkansas and has been a residential and commercial Sport Court® Distributor under an exclusive agreement with CSCI since 2006.

24.    Plaintiff Helfers Lawn and Landscape LLC d/b/a Sport Court St. Louis is a limited liability company organized under the laws of Missouri and has been an exclusive residential and non-exclusive commercial Sport Court® Distributor under an exclusive agreement with CSCI since 2013.

25.    Defendant Connor Sport Court International, LLC is a foreign limited liability company registered in Utah with a principal place of business at 5445 West Harold Gatty Drive, Salt Lake City, Utah 84116 and may be served through its registered agent, Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101.

26.    Defendant Gerflor USA, Inc. is a foreign corporation registered in Utah with a principal place of business at 750 Veterans Parkway, Suite A, Bolingbrook, Illinois 60440 and may be served through its registered agent, CT Corporation System, 1108 East South Union Avenue, Midvale, Utah 84047.

27.     Defendant Snap Lock Industries, Inc. is a corporation organized and registered in Utah with a principal place of business at 2330 W California Avenue, Salt Lake City, Utah 84104 and may be served through its registered agent, Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as Plaintiffs allege violations of the Sherman Act as amended by the Clayton Act (15 U.S.C. §§ 1-38) and violations of the Lanham Act (15 U.S.C. §§ 1051 et seq.). Venue is proper in this Court pursuant to 15 U.S.C. § 15, 28 U.S.C. § 1391, and the venue selection clause of the contracts between the Plaintiffs and Defendant CSCI.

## FACTS

BACKGROUND

29.     In 2005, Sport Court, Inc., a pioneer in the concept of the backyard game courts and leading manufacturer of high-performance modular tile sports flooring systems for both indoor and outdoor applications, merged with Connor Sports Flooring, an industry leader in sports hardwood flooring to create CSCI. CSCI has continued to manufacture and distribute premium sports flooring products marketed and sold under the Sport Court® brand. Sport Court® sports flooring products are used by families, school districts, municipal parks and community centers, and organizations such as the NBA, USTA, NCAA, USA Volleyball, FIBA Basketball, Futsal, U.S. Soccer and USA Pickleball.

30.     Plaintiffs are (or, until recently in some cases, were) exclusive residential and/or commercial distributors of Sport Court® products under exclusive distributor agreements with

CSCI. Several of the Plaintiffs have been Sport Court® distributors for decades and have built strong, successful, well-respected and recognized businesses in their exclusive distribution territories, helping to grow and strengthen the Sport Court® brand and reputation. CSCI's continued success rests on the backs of its exclusive distributor network such as Plaintiffs.

31.    Defendant Snap's SnapSports division has been a direct competitor of Sport Court® for many years, but had generally been known in the market as a lower quality, less expensive alternative to Sport Court®.

32.    In fact, CSCI previously sued Snap in this District in April 2005 alleging breach of a non-compete agreement between the two companies, trademark infringement and breach of employment agreements and trade secret misappropriation by two former employees, Jeremiah Shapiro (now current VP of Operations for Snap) and Dan Wollman. (Case No. (2:05-cv-00328-TS, ECF No. 1). That case was dismissed in July 2006 after the parties entered into a settlement agreement. *Id.* at ECF No. 161.

GERFLOR'S ACQUISITION OF SNAP LOCK INDUSTRIES

33.    Prior to Gerflor's acquisition of CSCI in 2014, the Sport Court® product line included entry level and mid-range products as well as premium products, following the well-established and successful 'good-better-best' sales model. Those entry and mid-level products were valuable to Plaintiffs' businesses as it allowed them to offer a cost-effect alternative to customers who were not interested in investing in premium products.

34.    CSCI's decision to eliminate entry and mid-level products from the Sport Court® product lineup without replacing them with a comparable product or other viable alternative for Distributors to sell has and continues to affect Distributors' sales and revenues. Obviously, less

product offerings leads to lower sales and lower revenues. The benefit once enjoyed by Distributors from being able to offer entry level and mid-range products to customers who were not interested or not yet willing to invest in the premium Sport Court® products is gone. These breaches of the agreements by CSCI has hindered Plaintiffs' ability to remain competitive, particularly against Gerflor owned competitor, SnapSports.

35.    After Gerflor's acquisition of Snap, Plaintiffs were assured that there would be a "Chinese wall" between CSCI and Snap, yet according to the current records of the Utah Secretary of State for CSCI (Exh. 1), Snap (Exh. 2) and Gerflor (Exh. 3):

> (1) Benjamin Bachman is a manager of CSCI, President of Snap, and Officer of Gerflor;
>
> (2) Edouard Phelippeau is a manager of CSCI, and Director of Snap.
>
> (3) Bertrand Chammas is a manager of CSCI and Director of Gerflor;
>
> (4) Thibaut Godard is Treasurer of Snap and Officer of Gerflor.

36.    Also, after Gerflor's acquisition of Snap, Plaintiffs began to experience issues that affected their business. One of the primary issues was increased presence of SnapSports distributors and internal sales team making false, misleading claims and misusing Sport Court® trademarks. Several Plaintiffs have heard from customers that SnapSports is holding itself out as being under the same Gerflor umbrella as Sport Court®, using the same raw materials, sharing the same manufacturing facilities and other statements deliberately misrepresenting that Snap Sports and Sport Court products are of identical quality. Further, Plaintiffs have submitted to CSCI multiple instances of trademark infringement by SnapSports dealers, many of which seem to have gone unaddressed.

37.     In addition, several Plaintiffs that serve the commercial sports flooring market have faced increased competition and false representations by Snap in competitive bids. In addressing these situations, Plaintiffs have heard statements such as "I hear you guys are the same company now," and that both SnapSports and Sport Court® "are both Gerflor companies with the same raw materials and shared manufacturing processes." Obviously, such misleading marketing by Snap has caused undue confusion in the marketplace and resulted in damage to Plaintiffs who are not allowed to offer SnapSports products to their customers.

38.     As one example, a Plaintiff submitted a competitive bid for a public project where a municipality was expected to invest approximately $600,000 on multiple new court projects. This municipality had worked with the Plaintiff previously and been very pleased with the projects. In fact, the bid specified use of Sport Court® products. As part of the bid process, the Plaintiff had requested and received special pricing from CSCI to support this project, meaning CSCI was aware of the details of the bid submitted by Plaintiff. However, at the last minute, it was learned that Gerflor submitted a bid substituting SnapSports products that undercut Plaintiff's bid by over $200,000. This last minute, unexpected, and substantially lower bid made it difficult for the municipality to hold to the specification, particularly given the misconception that SnapSports and Sport Court® products were equivalent. Common sense would dictate that Snap learned about Plaintiff's bid details from CSCI.

39.     Paragraph 37 is just one example. Plaintiffs have learned of several instances where CSCI has refused to lower pricing for Sport Court® products to meet SnapSports where a Sport Court® Distributor is in a competitive bid with SnapSports. This could not happen unless CSCI management and leadership are aware of SnapSports pricing strategies.

40.     Other issues experienced by Plaintiffs' have been delays in product shipping, quality issues including coloration mismatches, modular flooring tiles coming apart under heavy play, buckling of tiles and others. In addition, CSCI has increasingly denied warranty claims on products, even where the issue affects player safety, leaving Plaintiffs to expend their own resources to maintain a positive customer relationship.

41.     One Plaintiff was actually sued by a customer over products that should have been covered by warranty. CSCI declined to provide any defense or coverage to the Distributor, meaning the Distributor was left to defend the suit on their own.

42.     In addition, it is clear that there is consistent communication between CSCI and Snap management. One Plaintiff was invited to Salt Lake City to view a new product under development. At that meeting were employees and executives of both CSCI and Snap and it was unclear under which company the new product was being developed or would be released.

43.     For a recent CSCI Network Dealer Meeting, Snap VP of Operations, Jeremiah Shapiro, was on the invite list. And it turns out that Ryan Day, CSCI Managing Director, and Jeremiah Shapiro have offices next to one another. Mr. Day has also previously stated that he sits on a committee with Snap leadership to see how best practices can be applied to both companies and the best way to integrate products and services over time. Clearly, there is no Chinese wall separating these two competitors.

PLAINTIFFS' ONGOING ISSUES WITH CSCI

44.     While Plaintiffs' Distributor Agreements have minor variations as they were signed at different times over the years, CSCI has certain obligations common to those agreements including:

11

(1) CSCI shall not modify the Sport Court® portfolio in such a manner that it significantly impacts a Distributor's business;

(2) CSCI is committed to providing innovative new technologies that will allow for continual business growth;

(3) CSCI shall provide competitive pricing for products as it relates to the market, product positioning, branding and performance;

(4) CSCI shall promptly refer all orders and inquiries received by CSCI for residential products to the Distributor in the customer's territory';

(5) CSCI shall provide products within a reasonable time and within reasonable quality standards;

(6) CSCI shall provide a warranty program on all products that is representative of quality manufacturing standards and competitive in the marketplace;

(7) Further, Plaintiffs have invested heavily in marketing and promoting the Sport Court® brand and have repeatedly reported trademark infringement to CSCI which CSCI is apparently failing to enforce.

45.     Based on these continuing issues, Greg Dettman of Plaintiff Southwest Courts and Floors, Inc. engaged counsel who sent a letter to CSCI Manager Benjamin Bachman on September 13, 2024. Exh. 4. That letter was ignored.

46.     Later that month, CSCI held a national network dealers' meeting where attendees were required to sign additional non-disclosure agreements, essentially blocking attendees from discussing the meeting with any dealer or distributor that was not in attendance. Such a demand was unprecedented as information had previously been freely distributed to all CSCI distributors.

47.     Then, in March 2025, Ryan Day sent a letter to all CSCI exclusive distributors introducing new CSCI legal counsel and containing veiled threats of legal action such as the following:

- We also expect all dealers to honor their contractual commitments and uphold the integrity of the Sport Court brand.

- Sport Court explicitly reminds all dealers that, as per the Dealer Agreement, acrylic-painted courts are a competing product. The sale, promotion, or endorsement of competing products, directly or indirectly, is strictly prohibited under the Dealer Agreement.

- Furthermore, any leads supplied by Sport Court, or leads generated through the use of the Sport Court brand in any capacity, that are used to promote or sell competing products including acrylic surfaces constitute a direct violation of the Dealer Agreement and will be subject to enforcement actions.

- Sport Court will take all necessary steps to protect the integrity of our brand and ensure compliance with contractual obligations.

- Unsubstantiated allegations made without factual basis will not be tolerated and may impact your standing as a Sport Court Dealer.

- Sport Court expects full compliance with all terms of the Dealer Agreement. Any violations will be directly addressed on an individual basis with each individual dealer.

Exh. 5.

48.    This letter also changed CSCI's prior stance regarding acrylic products, a lower cost alternative to modular tile. In fact, several years ago, CSCI actually offered an acrylic product. After that product was discontinued, Sport Court® distributors were still encouraged to offer acrylic as a channel for future sales of Sport Court® products.

49.    Also, in an email to one Plaintiff in 2019, Ryan Day stated that, "Acrylic, though a competing product in the market does not currently constitute an issue with the non-compete."

50.    His March 2025 letter was now reversing that position and informing the exclusive distributor network that they could no longer offer acrylic surfaces to customers through their Sport Court® businesses, further eroding Plaintiffs' competitive positions.

CSCI'S RETALIATORY ACTIONS AGAINST PLAINTIFFS

51.     The requirement to sign an NDA to attend a national dealer network meeting in

September 2024 and Ryan Day's March 2025 letter created a feeling of distrust among Sport

Court® Distributors and raised concerns about CSCI and Gerflor's intentions moving forward

and the relationship between CSCI and Snap. Believing their concerns were not being heard or

addressed by Ryan Day, CSCI, or Gerflor, and with threats of legal action looming for any

alleged misstep, real or imagined, the current fifteen Plaintiffs joined together and created Sport

Ventures, LLC, a Georgia limited liability company, to present their concerns to CSCI as a

unified voice through counsel.

52.     Counsel sent a letter to Ryan Day, managing Director of CSCI, and Benjamin

Bachman, CEO of Gerflor on June 19, 2025 raising issues of the relationship between CSCI and

SnapSports, CSCI's breaches of Exclusive Distributor Agreements, continuing trademark

infringement issues, lack of innovative new products, ongoing warranty issues, lack of a national

marketing program, and CSCI's recent ban on Distributors offering acrylic surfaces as an

alternative to their customers. Exh. 6. That letter ended with a reasonable request that Plaintiffs

and CSCI/Gerflor management meet to discuss these concerns and reach a resolution that would

be fair and beneficial to both sides.

53.     Rather than inviting a conversation to address these common concerns and

provide assurances to the Distributor network regarding CSCI and Gerflor's plans related to

Gerflor's joint ownership of CSCI and Snap, Ryan Day immediately became adversarial and

combative. On June 27, 2025, Mr. Day responded, stating that, despite having the full roster of

Sport Ventures, LLC members, CSCI was not willing to discuss the issues raised in the June 19

letter and refusing to meet with the members of Sport Ventures, LLC as a group. Instead, Mr. Day denied all allegations without further explanation or reasoning and threatened legal action against the members of Sport Ventures, LLC. Exh. 7.

54.     That same day, every Plaintiff received a Notice of Breach of NDA and 60-Day Cure Period alleging the members of Sport Ventures, LLC had violated their non-disclosure agreements. In addition, several Plaintiffs were accused of failing to meet performance targets and required to submit a business plan and conduct a one-on-one meeting with Mr. Day within 60 days. Exh. 8 includes a sample of the Notice of Breach letters. Clearly, CSCI was upset that several Distributors had banded together to get some long overdue answers from CSCI and was beginning to follow through on the legal threats Ryan Day raised in March.

55.     Further, of those Distributors accused of underperformance, several were clearly not underperforming. In at least two instances, a Distributor's sales figures were down because Ryan Day had specifically asked them to push 2024 orders into 2025 to make Sport Court® corporate sales numbers look better. In both instances, he promised the Distributor would receive credit and co-op marketing dollars for those sales in their 2024 performance numbers, a fact he omitted from his initial accusations.

56.     For other targeted Distributors, at the time of these letters or shortly after, they had already met or exceeded their 2025 performance targets, showing they were clearly meeting their goals.

57.     Plaintiffs' counsel responded on July 3, 2025 again requesting a meeting to address Plaintiffs' concerns. In that letter, counsel reiterated that Plaintiffs:

> have serious concerns and are experiencing economic harm as a result of
> Gerflor's acquisition of Snap Sports, Sport Court failing to meet its obligations,

> breaking promises, reversing direction and leaving its members confused and
> unsure of the future. These members have come together with one voice to try
> and resolve these issues. All Sport Ventures, LLC members wish to continue
> their relationship with Gerflor, however, we demand that Gerflor respect its
> Distributor Agreements. My clients' businesses have been and continue to be
> damaged by Gerflor's actions.

Exh. 9.

58.     Mr. Day responded on July 16, 2025 again refusing to meet with Plaintiffs as a

group and stating that, "CSCI routinely engages with the entire network to address questions or

concerns, and holding separate meetings with select groups of dealers or distributors would

compromise the consistency and transparency of our communications." Exh. 10. Yet, after

touting the "consistency and transparency" of communications with the "entire network.", Mr.

Day points out that, "at least five of Sport Ventures' members were not present in the dealers

meeting in September of 2024, and any discussion about the contents of the September dealers

meeting violates the express provisions of the NDA they signed prior to the meeting…" and

threatens termination of Plaintiffs' agreements with CSCI.

59.     Counsel responded on July 25, 2025 seeking clarification of Mr. Day's allegations

concerning NDA breaches, outlining the need for guidance from CSCI for Plaintiffs to develop

business plans, including 2025 annual sales targets for each Distributor. The sales targets are

something CSCI is required to negotiate with its Distributors each year. Instead, over the past

several years, CSCI has either failed to negotiate or simply dictated a number rather than

working with the Distributors to formulate a realistic number, often after several months of the

year had already passed. Counsel again reiterated that the intent of these communications was for

Plaintiffs, "to have their issues heard and to meet with CSCI/Gerflor to discuss these concerns

and work collaboratively to address them. We are perplexed by CSCI's reluctance to meet with

this group of distributors that make up a significant portion of Sport Court sales and revenue generation." Exh. 11.

60.    In response, Mr. day then sent individual letters to all fifteen Plaintiffs on July 30, 2025. In those letters, Mr. Day reiterates that CSCI will not meet with Plaintiffs as a group, citing that terms of individual Distributors may be different and the need to maintain confidentiality of those terms. Yet the issues raised by Plaintiffs repeatedly to CSCI were not focused on individualized terms of the Distributor Agreement, but rather to CSCI operations, interactions and the relationship between CSCI and Snap, trademark violations, marketing, warranty issues and other issues of common concern that do not touch on individual Distributor Agreements.

61.    Mr. Day further in those letters went into individualized numbers in terms of the Plaintiffs' participation in CSCI marketing initiatives and lead generation, benefits to individual members of CSCI partnerships, CSCI product development, co-op marketing, and pricing. Interestingly, while declining to meet with Plaintiffs as a group, Mr. Day states that, "CSCI leadership has always remained accessible to our network and has **never refused a meeting** with any dealer or distributor."

62.    In further communications with CSCI through counsel, it has been repeated *ad nauseum* that CSCI refuses to meet with Plaintiffs as a group or with any subset, even just two or three Plaintiffs, at a time. CSCI will only entertain one-on-one meetings which must be held in Salt Lake City (although one offer to meet some Plaintiffs one-on-one in Nashville was offered).

63.    And even though many Distributors were in Salt Lake City for the annual Network Dealer's Meeting in September, Mr. Day made it clear that he would not meet with any

17

of the Distributors in the weeks surrounding that meeting, instead demanding that Distributors return at a later date to Salt Lake City, incurring additional travel expenses and time away from their businesses.

64.    In addition, for those Plaintiffs accused of underperformance, CSCI demanded a business plan followed by a one-on-one meeting with Ryan Day. It should be noted that for many Sport Court® exclusive distributors, Sport Court® may be only one product offering among several under a larger overall business. Those affected Plaintiffs provided business plans to CSCI on September 22, 2025 related to their Sport Court® business, only to be told that they did not include all of the information CSCI was requesting. And it was only in response to those business plans that CSCI, for the first time, sent a template showing the detailed, confidential information CSCI wanted to see.

65.    However, the information CSCI is demanding goes far beyond the Plaintiffs' Sport Court® businesses and seeks information on other aspects of the Plaintiffs' businesses including overall business revenues and marketing spend. These requests are well beyond the scope of information a vendor should require from an independent Distributor, whether exclusive or not, and more akin to what a franchisor may request from a franchisee. But that is not the relationship here – Plaintiffs are all independent contractors who happen to have the ability to be the exclusive distributor of Sport Court® products in their given territories.

66.    Plaintiffs are not willing to provide their proprietary business information unrelated to Sport Court® to CSCI or Ryan Day given the close relationship between Mr. Day and Defendant Snap – this would be tantamount to providing confidential marketing strategies and sales information to a director competitor, which is Snap.

18

67.     Ultimately, CSCI and these Plaintiffs reached an impasse – CSCI would not meet without business plans including Plaintiffs' non-Sport Court® proprietary information, which they are unwilling to disclose. As a result, on November 7, CSCI terminated the exclusive Distributor Agreements with the following Plaintiffs:

> (1) Custom Courts, Inc.
>
> (2) Southwest Courts and Floors, Inc.
>
> (3) Sport Court of the Rockies, LLC
>
> (4) Court Development, Inc.
>
> (5) Sport Court of South Florida, Inc.
>
> (6) Sport Court of Arkansas
>
> (7) Helfers Lawn and Landscape, LLC

68.     Upon information and belief, CSCI's terminations are retaliation for Plaintiffs' participation in Sport Ventures, LLC as Plaintiffs are unaware of any other underperforming Distributors being required to submit detailed business plans and attend in-person meetings in Salt Lake City.

69.     These wrongful terminations are immediately and irreparably damaging these Plaintiffs as they are unable to purchase product needed to complete existing projects already under construction or move forward with pending projects. Ultimately, if they are unable to secure product to complete these projects, the Plaintiffs could face breach of contract claims from their customers, not to mention the immediate loss of reputation and goodwill which have been built up over the years.

<u>CSCI'S ACTIONS AGAINST INDIVIDUAL PLAINTIFFS</u>

70.     CSCI has also taken action against several individual Plaintiffs.

*Southwest Courts and Floors, Inc.*

71.     First, CSCI targeted Plaintiff Southwest Courts and Floors, Inc. ("SCFI") owned by Greg Dettman, a Sport Court® Distributor since 1978, citing 39 pages of alleged brand standards violations from the Southwest Courts and Floors and Sport Court Texas websites. Many of these alleged violations had been on the websites for many years with no complaint or issue raised by CSCI. However, now CSCI demanded immediate action be taken and even placed a credit hold on Mr. Dettman's account with CSCI until he brought the sites into compliance with CSCI Brand Standards.

72.     CSCI has also recently required other Plaintiffs to change or remove digital materials that have been on websites for years citing violations of brand standards. Once again, CSCI appears to be taking aim only at the members of Sport Ventures.

*Allsport America, Inc.*

73.     Plaintiff Allsport America, Inc. was founded by Phil Park. His son, Barrett, has been an integral part of the business for several years. In 2023, Phil and Barrett informed CSCI that Barrett would be taking over the business completely through a "Popeye Plan" where Barrett would become the sole shareholder of the company. Prior to that notice, CSCI was well aware of Barrett's role in the company as he had been the signatory on yearly budget plans since 2020 and had been invited to Distributor network and sales meetings for the company instead of Phil, and had grown the company substantially with his efforts.

74.     Under the Distributor Agreement between CSCI and AllSport America, Inc., there is a clause (Section 21) controlling transfers of a Distributor Company which reads:

**Sale, Assignment, Abandonment or Other Disposition.** Residential Distributor may not abandon, sell, assign, transfer, or otherwise voluntarily or involuntarily dispose of any interest, right, or obligation under this Agreement, whether directly or indirectly through a change of ownership or control of Residential Distributor, without the prior written approval of CSCI, **which approval shall not be unreasonably withheld**.

Barrett holds an MBA and could have taken his career in many directions. But Barrett relied on the clear terms of this clause as assurance that he would be able to take over AllSport America from his father, Phil. He has built his livelihood and supports his family based on the assurance that CSCI would have no reason to withhold its approval given his strong record of performance.

75.     As stated above, CSCI was put on notice in 2023 of the transfer of AllSport America, Inc. from Phil Park to Barrett Park. CSCI continued to work with AllSport America and treated Barrett as the owner. For the first time, CSCI informed AllSport America that its agreement with CSCI was no longer exclusive, meaning CSCI could introduce new Sport Court® dealers into AllSport America's sales territory.   Ryan Day's June 30, 2025 letter claims that CSCI had not approved of the transfer but provides no reason the approval was withheld. Instead, Mr. Day states that AllSport America must enter into a new agreement with CSCI for Barrett to be recognized as the owner.

*Allegedly Underperforming Plaintiffs*

76.     In addition, for those Plaintiffs accused of underperformance, CSCI demanded a business plan followed by a one-on-one meeting with Ryan Day. It should be noted that for many Sport Court® exclusive distributors, Sport Court® may be only one product offering among several under a larger overall business. Those affected Plaintiffs provided business plans to CSCI on September 22, 2025 related to their Sport Court® business, only to be told that they did not include all of the information CSCI was requesting.

77.    However, the information CSCI is demanding goes far beyond the Plaintiffs'
Sport Court® businesses and seeks information on other aspects of the Plaintiffs' businesses
including overall business revenues and marketing spend.

78.    Plaintiffs are not willing to provide their proprietary business information
unrelated to Sport Court® to CSCI or Ryan Day given the apparent close relationship between
Mr. Day and Defendant Snap – this would be tantamount to providing confidential marketing
strategies and sales information to a direct competitor, which is Snap.

79.    Ultimately, CSCI and these Plaintiffs reached an impasse – CSCI would not meet
without business plans including Plaintiffs' non-Sport Court® proprietary information, which
they are unwilling to disclose. As a result, on November 7, CSCI terminated the exclusive
Distributor Agreements with the following Plaintiffs:

> (1) Custom Courts, Inc.
>
> (2) Southwest Courts and Floors, Inc.
>
> (3) Sport Court of the Rockies, LLC
>
> (4) Court Development, Inc.
>
> (5) Sport Court of South Florida, Inc.
>
> (6) Sport Court of Arkansas
>
> (7) Helfers Lawn and Landscape, LLC

80.    These wrongful terminations are immediately and irreparably damaging these
Plaintiffs as they are unable to purchase product needed to complete existing projects already
under construction or move forward with pending projects or jobs that have been previously bid.
Ultimately, if they are unable to secure product to complete these projects, the Plaintiffs could

face breach of contract claims from their customers, not to mention the immediate loss of reputation and goodwill which have been built up over the years.

81.    CSCI is once again demanding that, for any of these Plaintiffs to move forward, they must provide a business plan and sign a new, non-negotiable, exclusive Distributor Agreement.

### CSCI'S DEMAND FOR NEW DISTRIBUTOR AGREEMENTS

82.    The call for a new Distributor Agreement is one that CSCI has made several times. Apparently Gerflor, after eleven years of owning CSCI, is unhappy with the current agreements it has with its exclusive distributors and wants a change.

83.    CSCI has wrongfully withheld approval of the transfer of AllSport America from Phil Park to Barrett Park without citing any reason in violation of Section 21 of the Distributor Agreement, instead removing AllSport America's exclusivity and demanding that Barrett sign a new agreement to become exclusive again.

84.    CSCI has taken the unprecedented step of calling out alleged underperforming distributors, demanding sensitive and proprietary business information unrelated to those Plaintiffs' Sport Court® businesses, and, when they rightfully refuse to provide it, CSCI terminates their agreements and demands they enter into a new agreement.

85.    Ryan Day has previously told some Plaintiffs that there would be no negotiation of any new agreements because Gerflor owns CSCI. And yet, despite repeated requests over the past several months, CSCI has yet to provide any Plaintiff with a draft of the new agreement for review.

### IMMEDIATE AND IRREPARABLE HARM

86.     CSCI's actions are causing immediate and irreparable harm to those Plaintiffs who have had agreements terminated.

87.     As of the date of this filing, for the seven terminated Plaintiffs, there are multiple projects representing over 324,000 square feet of flooring surfaces to be installed. That is over $866,000 in projects under contract, over $576,000 in pending contracts, and about $314,000 in outstanding bids that could be accepted which have been specified for Sport Court® products. That is over $1.77 million in sales of Sport Court® products which CSCI has denied.  Those numbers only represent the dollars which would be spent purchasing from CSCI. When the total project costs are calculated, the seven affected Plaintiffs stand to lose over $5 million dollars in total revenue in the short term.

88.     Beyond the immediate loss, all Plaintiffs stand to lose valuable goodwill built over years and sometimes decades. In light of CSCI's position with AllSport America, Plaintiffs who have built their businesses with an eye toward transfer to a family member or sale, CSCI's actions continue to erode the value of those businesses as revenues are affected by unfair competition from Snap and believed collusion between CSCI and Snap.

89.     Plaintiffs are requesting the Court reverse the termination of contracts and declare that their Distributor Agreements are in full force and effect, seeking all loss and damages resulting from CSCI's actions, and treble damages as allowed under the Sherman and Clayton Acts.

## STANDING

90.     Plaintiffs have standing to bring these claims under Sections 4 and 16 of the Clayton Acts (15 U.S.C. §§15 and 26) and 15 U.S.C. §1125 (Lanham Act). Plaintiffs are being

directly harmed in a way impacting their businesses as a direct result of CSCI's violations of §§ 7 and 8 of the Clayton Act and 15 U.S.C. § 1125. These injuries are direct and palpable. Under 15 U.S.C. §15, Plaintiffs are entitled to recover threefold their actual damages plus interest and attorneys' fees and costs. Under 15 U.S.C. §26, Plaintiffs are also entitled to injunctive relief.

## COUNT ONE: VIOLATION OF THE LANHAM ACT

91.     Plaintiffs incorporate paragraphs 1 through 90 by reference as if set forth fully herein.

92.     Defendant Snap and its dealers are making false misrepresentations in the marketplace that Snap and Sport Court are essentially the same company and same products leading to confusion among consumers.

**93.**     These misrepresentations are (1) clearly false; (2) deceive, or have the capacity to deceive, consumers; (3) the deception has a material effect on purchasing decisions; (4) the misrepresented product or service affect interstate commerce; and (5) the Plaintiffs have been and continue to be injured as a result of the false advertising.

**94.**     Defendants' actions are a direct and proximate cause of Plaintiffs' injuries.

**95.**     Such injuries will continue unless Defendants are enjoined from making misrepresentations that deceive and confuse consumers.

## COUNT TWO: VIOLATION OF CLAYTON ACT SECTION 7

96.     Plaintiffs incorporate paragraphs 1 through 82 by reference as if set forth fully herein.

97.     Gerflor's acquisition of Snap is a violation of Section 7 of the Clayton Act insofar as the acquisition is designed to substantially lessen competition and/or to create a monopoly in the sports flooring market, a market where CSCI and Snap have historically been competitors.

98.     One Plaintiff attended a product development meeting which included personnel from both CSCI and Snap to discuss product development for a new flooring surface. At that meeting, it was unclear which company was doing the development or under which company the product would be released.

99.     Plaintiffs have also experienced undercutting of bids as a direct result of communications between CSCI and Snap who are, on information and belief, sharing pricing information and confidential bid proposals of the Plaintiffs.

100.    Plaintiffs have experienced actual damages in an amount to be determined as a direct result of CSCI and Snap's actions.

## COUNT THREE: VIOLATION OF CLAYTON ACT SECTION 8

101.    Plaintiffs incorporate paragraphs 1 through 82 by reference as if set forth fully herein.

102.    Defendants are in violation of Section 8 of the Clayton Act which prohibits interlocking directorates and officers. Section 8 prohibits any person from serving as "a director or officer in any two corporations…that are: (A) engaged in whole or in part in commerce; and (B) by virtue of their business and location of operation, competitors…."

103.    On information and belief, Defendants have capital, surplus and undivided profits aggregating more than the 2025 Federal Trade Commission threshold amount required by Section 8..

104.    Plaintiffs refer the Court to paragraph 33 herein and reiterate that according to the records of the Utah Secretary of State for CSCI (Exh. 1), Snap (Exh. 2) and Gerflor (Exh. 3):

(1) Benjamin Bachman is a manager of CSCI, President of Snap, and Officer of Gerflor;

(2) Edouard Phelippeau is a manager of CSCI, and Director of Snap.

(3) Bertrand Chammas is a manager of CSCI and Director of Gerflor;

(4) Thibaut Godard is Treasurer of Snap and Officer of Gerflor.

## COUNT FOUR: BREACH OF CONTRACT

105.    Plaintiffs incorporate paragraphs 1 through 81 by reference as if set forth fully herein.

106.    Plaintiffs each have (or, until recently, had) a valid and enforceable exclusive Distributorship Agreement with CSCI.

107.    CSCI has breached those agreements in one or more ways by modifying the product portfolio in such a manner that it significantly impacts Plaintiffs' businesses, denying valid warranty claims, failing to provide a comprehensive national marketing plan, and failing to properly police its trademarks resulting in the name Sport Court® becoming almost a generic term used consistently by Google and others for any modular sports flooring product.

108.    CSCI has further breached its agreement with Plaintiff AllSport America, Inc. by unreasonably withholding approval of the transfer of the company from Phil Park to Barrettt Park in violation of Section 21 of the Agreement.

109.    CSCI has further breached its agreements with Plaintiffs Custom Courts, Inc., Southwest Courts and Floors, Inc., Sport Court of the Rockies, LLC, Court Development, Inc.,

Sport Court of South Florida, Inc., Sport Court of Arkansas, and Helfers Lawn and Landscape, LLC by wrongfully terminating those agreements without cause.

110.    Plaintiffs have all suffered damages as a result of Defendants' actions in an amount to be calculated.

111.    CSCI's actions are a direct and proximate cause of those damages.

### COUNT FOUR: TORTIOUS INTERFERENCE WITH CONTRACT

112.    Plaintiffs incorporate paragraphs 1 through 81 by reference as if set forth fully herein.

113.    Plaintiff AllSport America, Inc. brings a claim for tortious interference with contracts as a result of CSCI's removal of AllSport America, Inc.'s exclusive rights to its territories.

114.    Plaintiffs Custom Courts, Inc., Southwest Courts and Floors, Inc., Sport Court of the Rockies, LLC, Court Development, Inc., Sport Court of South Florida, Inc., Sport Court of Arkansas, and Helfers Lawn and Landscape, LLC bring claims for tortious interference with contracts as a result of CSCI's wrongful termination of their exclusive Distributor Agreements. Each of these Plaintiffs have contracted projects, pending contracts and outstanding bids at this time worth over $5 million in revenue. By denying these Plaintiffs the ability to purchase Sport Court® products to fulfill these contracts, CSCI is interfering with Plaintiffs' business relationships with their customers and exposing them to potential liability if they are unable to perform.

115.    These Plaintiffs have all suffered, and continue to suffer, damages as a result of CSCI's action, which are a direct and proximate cause of these damages,

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter judgment against Defendants and in favor of Plaintiffs and enter an order containing the following relief:

1. Injunctive and other equitable relief as is necessary to protect Plaintiffs including: (a) reinstatement of wrongfully terminated exclusive Distributor Agreements; (b) reinstatement of AllSport America, Inc.'s exclusivity and approval of the transfer from Phil Park to Barrett Park.

2. Declaratory relief, including but not limited to, a declaration and judgment that Plaintiffs' Distributor Agreements with CSCI remain valid and enforceable;

3. Injunctive relief;

4. Treble damages;

5. Reasonable attorneys' fees and costs;

All such other relief in law or equity to which Plaintiffs may be entitled.


DATED: November 17, 2025              Respectfully submitted,

MASCHOFF BRENNAN

By: /s/ Sterling A. Brennan
Attorneys for PLAINTIFFS